**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christine Held, | No. CV-12-1302-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Riversource Life Insurance Company, et al., | |
| Defendants. | |

Before the Court are Defendants' Motion for Summary Judgment or Alternatively for Partial Summary Judgment (Doc. 85), Plaintiff's Motion for Partial Summary Judgment (Doc. 91), the Responses, and the Replies. For the following reasons, Defendants' Motion will be granted.

**I.    Background**

Christine Held purchased an Individual Disability Income Insurance Policy from IDS Life Insurance Company, a predecessor in interest to Defendant RiverSource Life Insurance Company (RiverSource), that became effective March 15, 1991 (the Policy). The Policy was an "own occupation" policy, which insured against loss of income if Mrs. Held because unable to perform the important duties of her regular occupation, and provided for a monthly disability benefit of $1,525.00 for total disability. When Mrs. Held applied the Policy in February 1991, her regular occupation was a self-employed computer software trainer. On her Insurance Application, used to purchase the Policy, Mrs. Held's job duties were described as "a [sic] instructor/trainer for small and medium

size business and city and state government.  She trains office support staff how to use and operate current business application software packages.   Also, develops/modifies software for tailored applications."

The Policy Mrs. Held purchased contained the following definitions of disability:

Total disability means that because of injury or sickness, you are:

1. Unable to perform the important duties of your regular occupation; and

2. Under the regular and personal care of a licensed physician other than yourself.

Partial disability means that, although you perform one or more important duties of your regular occupation:

1. Because of injury or sickness, your monthly earnings are reduced to 80% or less of your monthly earnings before disability began; and

2. You are under the regular and personal care of a licensed physician other than yourself.

The Policy also included an "Occupation Protection Option," which allowed Mrs. Held to qualify for disability benefits even if she were able to return to work in an occupation other than her regular one.  The terms of that portion of the Policy were as follows:

You can qualify as totally disabled even if you work outside of your regular occupation.

This policy contains the Occupation Protection Option that you applied for. In this policy, "total disability" is defined to allow you to be considered totally disabled even if you work in an occupation that is not your regular one.

For example, suppose that your regular occupation is "neuro-surgeon." Suppose you become disabled. If you cannot perform neurosurgery, but can teach neurosurgery at a medical school, we would still consider you totally disabled and eligible for the total disability benefit.

Finally, the Policy included a "Claims Provisions" section that governed Mrs. Held's receipt of benefits under the Policy.  In relevant part, that section required Mrs. Held to give RiverSource proof of loss: "We must receive proof of loss within 90 days of the end of each period of disability for which we are liable."  That provision also informed Mrs. Held that "[a]s part of establishing proof of loss, we have the right to have a physician

1    examine you.  This will be done at our expense and at reasonable intervals."

2         In June 1991, Mrs. Held suffered a serious lower back injury that rendered her

3    unable to perform the important duties of her self-employed computer software trainer

4    occupation.  In August 1991, Mrs. Held submitted a Proof of Loss form to RiverSource in

5    which she described her occupation as a "Corporate Computer Trainer (Classroom

6    Training) (Software)" and described the duties of her occupation as "Standing and

7    teaching one-day seminars to corporations of various software, (hands on).  On feet 8-12

8    hours per day."  She listed the reason she had visited a physician after the onset of her

9    disability as "Inability to stand, extreme pain."  Mrs. Held's physician confirmed that she

10   was "unable to stand the 8-10 hours necessary to do her teaching because of her low back

11   pain."

12        On August 23, 1991, Mrs. Held met with a RiverSource representative for an

13   interview about her claim and signed a written narrative that confirmed the contents of

14   that interview.   In the narrative, Mrs. Held described her occupation as "a corporate

15   computer trainer" who did "classroom training."  Mrs. Held described the duties of her

16   occupation as "teaching 1 and 2 day seminars which requires me to be on my feet 8-12

17   hours a day."  She also told the RiverSource interviewer that, due to her back pain, Mrs.

18   Held could not "sit over 45 minutes or stand over one hour."

19         After completing an initial investigation of Mrs. Held's claim of total disability,

20   RiverSource processed the claim and approved it in October 1991.  RiverSource sent

21   Mrs. Held her first disability benefit payment on October 31, 1991.  After that initial

22   payment, RiverSource continued to pay Mrs. Held's total disability benefit of $1,525.00 a

23   month for 21 years without interruption.  At no time during that period did RiverSource

24   contest the severity of Mrs. Held's medical condition, nor did it contest the conclusion

25   that she could not stand for eight hours a day.  RiverSource also does not contest Mrs.

26   Held's medical condition in this lawsuit.

27        As part of its ongoing review of Mrs. Held's claim, RiverSource asked her to

28   complete a Claimant's Job Description form in August 1992.  On that form, Mrs. Held

described her job title as "Computer Software Trainer."  Mrs. Held listed the duties normal to her job as Training, Computer Learning, and Writing Manuals, and completed the following chart to describe those duties:

| Duty | Description of Duty | % of Time Devoted to This Activity | | Hours Spent at This Activity |
|---|---|---|---|---|
| Training | Teaching Business Employees computer skills | 70-75%, sometimes 100% | Long hours of standing | 8-10 hrs/ day |
| Computer Learning | Learning New software packages | 5-10 | Long hours of sitting | 8-10/ week |
| Writing Manuals | Writing manuals to train with | 20-25% | Long hours of sitting | 8-15/ week |

On the Job Description form, Mrs. Held also described the "physical requirements" of her job as "The ability to stand continuously for several hours. Also, at times, long periods of sitting."  In the space for "Special Skills Required," Mrs. Held described "Computer and people skills.  Writing software manuals."  Finally, in the "Comments" portion of the form, Mrs. Held indicated that "Being a trainer does not allow the flexibility of standing and sitting to take pressure off the back. It is one extreme or the other."

Mrs. Held has additionally testified that, at the time she became disabled, her job required her to teach in person, in a classroom setting.  In that setting, she was required to walk around the classroom, kneel, stoop, and bend to point at employee's computer screens.  In order to set up for presentation, Mrs. Held has to carry heavy classroom presentation equipment and travel from site to site.  When Mrs. Held had to learn new software and write software manuals, she had to sit for extended periods of time.

After its initial approval of her claim, RiverSource scheduled three independent medical examinations in 1993, 1996, and 1997.  RiverSource also asked Mrs. Held to provide periodic proof of loss statements, and statements from her own attending physicians.  Each year from at least 2002 until 2011, one or more of Mrs. Held's doctors sent RiverSource an Attending Physician's Progress Report, in which the doctor described her diagnosis and limitations.  In each of those years, and again in the most

recent report of December 2010, Mrs. Held's treating Orthopedic Specialist described Mrs. Held's condition as preventing her from standing or sitting for more than two hours at a time and from lifting more than 10 pounds.  Beginning in 2010, and again in his most recent report of December 2011, Mrs. Held's treating chiropractor described her condition as preventing her from standing or sitting for more than one hour continuously and from lifting more than 10 pounds.

Between her initial claim for total disability in 1991 and 1999, Mrs. Held worked administrative jobs and continued her education.  Each year from at least 1999 until 2011, Mrs. Held submitted Insured's Progress Report Forms to RiverSource in which she described whether she worked in another occupation and described the duties of the other occupation.  Beginning sometime in 2000, Mrs. Held began to work part time at the Mesa Community College (MCC), grading papers for self-paced classes.   She worked in various roles at MCC, including as a Program Director, supervisor, and faculty member over that period.  On each of the reports, Mrs. Held noted that she never intended to return to her previous occupation, and explained that she had been working in a different occupation which did not require long hours of sitting or standing.

Throughout this period, RiverSource evaluated Mrs. Held's total disability claim on the basis of her reports, and continued to pay Mrs. Held's claim.  RiverSource notified Mrs. Held in March 2010 that it used her medical records to evaluate her continued claim for benefits, and reviewed her claim "to determine if you are remain [sic] unable to perform the important duties of your regular occupation."  From 2000 until January 2012, Mrs. Held's primary contact at RiverSource was senior adjuster Todd Lamphere.  Mr. Lamphere did not conduct a comprehensive comparison of Mrs. Held's current occupational duties with those of her previous occupation during this period.

In February 2012, after Mrs. Held's claim was assigned to a new adjuster, Becky South, RiverSource asked Mrs. Held to complete a Claimant's Job Description and Educational Background form.  Mrs. Held returned the form to RiverSource, describing her prior occupational title as "Corporate Trainer," along with a letter to Ms. South

contrasting the duties of her occupation at the time she became disabled with her current position at MCC.  In the letter, Mrs. Held also indicated that Mr. Lamphere had been her claims specialist for 11 years and understood that, though her current occupation seemed similar to her previous one, there was a difference in duties.  Mrs. Held indicated that she was offended when first asked to describe her current occupation to RiverSource, and that academic faculty members were insulted if they were compared to trainers.  She emphasized that her new position did not require any standing for any length of time, and that the sitting required was not a problem because she had the flexibility to move around.  Mrs. Held also reported that in her faculty position, she conveyed theory and concepts to students in an academic online environment, while trainers train employees how to do a specific skill set.

In response to RiverSource's inquiry, Mrs. Held indicated that she had received her PhD in Technology Management,[1] and was Residential Faculty in the Business and Information Systems Department at MCC, specializing in E-learning.  In February 2012, her occupation was thus as a fully tenured Professor of Business Personal Computers, Computer Information Systems, and General Business.  Mrs. Held provided a detailed description of the important duties of that position.  Among those duties were: convey business and computer information system concepts and performance skills in an online format; design and maintain online courses; monitor student collaboration and grade student assignments; maintain office hours to answer student questions; review and select course materials; update course materials to ensure optimal learning; and research and publish articles.

Later in February 2012, Mrs. Held's claim was assigned to another new claims adjuster, Charlie Engh.  Mr. Engh notified Mrs. Held that he was assigned to her claim, after which Mrs. Held made several unsuccessful attempts to contact Mr. Engh.  On March 16, 2012, Mr. Engh sent Mrs. Held a letter in which he notified her that her

---

[1] The Court refers to Plaintiff as "Mrs. Held," rather than Dr. Held, throughout the Order because Plaintiff refers to herself as Mrs. Held in her briefing.

1    benefits had been approved through March 14, 2012, but that her claim was being

2    reviewed to determine whether any additional benefits should be paid.  Mrs. Held again

3    tried to reach Mr. Engh via phone and email, and was again unsuccessful.

4         Mr. Engh reviewed Mrs. Held's new job description and the duties of her current

5    occupation, and noted that in that position Mrs. Held did not have to stand or sit for any

6    long periods and did not have to lift, kneel, or stoop.  Comparing the duties of her current

7    position to her previous occupation, however, he determined that Mrs. Held would not be

8    unable to perform the material and substantial duties of her previous occupation.  Mr.

9    Engh based this conclusion on his determination that the essential duties of her current

10   occupation, which he characterized as learning new software and teaching others, were

11   similar to those of her previous occupation.  On March 28, 2012, Mr. Engh recommended

12   that RiverSource deny Mrs. Held continued payment of benefits, and submitted an

13   Adverse Claim Review form to Mr. Lamphere and Claim Manager Elsaa Ostergren.

14        Mr. Lamphere reviewed the file and compared Mrs. Held's current job description

15   with the duties of her previous occupation.   Mr. Lamphere also referenced the

16   Department of Labor's Dictionary of Occupational Titles (DOT) to review its description

17   of the duties of a Training Representative.  Mr. Lamphere concluded that Mrs. Held was

18   able to perform the important duties of her previous occupation within the limitations

19   imposed by her doctors.  As a result, Mr. Lamphere determined that Mrs. Held was not

20   totally disabled from her regular occupation and approved the Adverse Claim decision on

21   March 29, 2012.   The Claim Manager, Ms. Ostergren, approved the Adverse Claim

22   decision on March 30, 2012.

23        Mr. Engh sent Mrs. Held a letter, dated March 30, 2012, notifying her of

24   RiverSource's determination that it would no longer approve her benefits.  In the letter,

25   Mr. Engh described Mrs. Held's previous occupation as "a self employed [sic] computer

26   training consultant" which required her "to do classroom training of computer software."

27   RiverSource had determined, according to the letter, that Mrs. Held was not totally

28   disabled from her own occupation, referencing the definition of total disability from the

Policy, and listed the documentation on which the determination was made.  Mr. Engh went on to explain that RiverSource determined that Mrs. Held was "capable of performing your own occupation as a computer training consultant as it is generally performed in the economy."  In denying Mrs. Held's claim, RiverSource accepted her medical diagnosis and the limitations imposed by her doctors.  RiverSource did not request an independent medical examination, a vocational analysis, or the input of any vocational experts before denying her claim in March 2012.

Mrs. Held wrote Mr. Engh a hostile email on April 2, 2012, in which she contested his determination that she was not totally disabled and asked for documentation supporting it.  On April 3, 2012, Mrs. Held wrote another email to Mr. Engh and Ms. Ostergren, in which she argued the termination of her benefits was in error and again emphasized that she was no longer able to be a trainer because she could not stand those hours.  Several times in April, Mrs. Held sent additional emails and faxes following up.  Mr. Lamphere was responsible for handling the review of the claim, but failed to review the additional information Mrs. Held submitted before May 17, 2012.  On that day, Mrs. Held filed this lawsuit, so no additional review followed.

## II.    Legal Standard

A party moving for summary judgment must demonstrate that there is no genuine issue as to any material fact in order to be entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A material fact is one that might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant has the burden of showing the absence of genuine issues of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

However, once the movant meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion.  The party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial," and may not rest upon the pleadings.  *Anderson*, 477 U.S. at 256.  As a result, the opposing party may not simply

describe a fact as disputed to defeat summary judgment; rather, the nonmoving party must produce sufficient evidence in their favor for a jury to return a verdict for that party. *Id*. at 249.

At the summary judgment stage, the nonmoving party's evidence is presumed true, and all inferences from the evidence are drawn in the light most favorable to the non-moving party. *Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850, 864 (9th Cir. 2009). As a result, a court does not make credibility determinations or weigh conflicting evidence at this stage. *Porter v. California Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). However, the Ninth Circuit has refused to find a "genuine issue" where the only evidence presented is "uncorroborated and self-serving" testimony. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citing *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)).

## III.   Analysis

The threshold issue in this case is one of contract interpretation: whether Mrs. Held is totally disabled within the definition of total disability in the Policy—"[u]nable to perform the important duties of your regular occupation." The interpretation of a contract is generally a question of law for the court. *Powell v. Washburn*, 211 Ariz. 553, 555, 125 P.3d 373, 375 (2006). When the language of a contract is clear and unambiguous, a court must interpret the contract to give it "effect as it is written." *Hadley v. Sw. Properties, Inc.*, 116 Ariz. 503, 506, 570 P.2d 190, 193 (1977).

### A.   Definition of "Regular Occupation"

The Policy is an "own occupation" policy, which allows Mrs. Held to be considered totally disabled even if she worked in an occupation that was not her regular one. Own occupation policies provide benefits to the insured when she is unable to perform "the material duties of her chosen profession." The Policy therefore insured Mrs. Held against the loss of the ability to perform her regular occupation as a Corporate Trainer, not any other occupation. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1007 (9th Cir. 2004). That means that if Mrs. Held was unable to perform the

important duties of her regular occupation, she would be totally disabled even if she could take on another occupation.

The term "regular occupation" is not defined in the Policy.  However, the term "regular occupation," as used in context in the Policy, "unambiguously refers to the usual work that the insured performed immediately before the onset of disability." *Wirries v. Reliance Standard Life Ins. Co.*, 247 F. App'x 870, 871 (9th Cir. 2007).  In order to determine whether Mrs. Held was able to perform the important duties of her regular occupation, then, the Court must determine what those duties were when she became disabled in June 1991.

### B.    Important Duties of Mrs. Held's Regular Occupation

In order to determine the duties of Mrs. Held's regular occupation of Corporate Trainer in June 1991, however, the Court need not determine what Mrs. Held did in her specific position.  "Occupational disability policies protect against the loss of the ability to perform the principal duties of a particular occupation, not a particular position." *Yahiro v. Nw. Mut. Life Ins. Co.*, 168 F. Supp. 2d 511, 516 (D. Md. 2001).  Nevertheless, though "regular occupation" should not be defined so narrowly as to include only the characteristics of Mrs. Held's particular position, "it must be defined as a position of the same general character as her job." *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 253 (2d Cir. 1999) (internal quotation marks omitted).

Mrs. Held contends that this interpretation of "regular occupation" is inappropriate, and that instead the Court should look to what Mrs. Held did in her specific position to determine what the important duties of her regular occupation were. In support of that conclusion, Mrs. Held relies on *Wirries*.  But in *Wirries*, the Ninth Circuit affirmed the district court order, which expressly adopted the interpretation of "regular occupation" from *Kinstler*.  *Wirries v. Reliance Standard Ins. Co.*, CV 01-565-E-MHW, 2005 WL 2138682, *5 (D. Idaho Sept. 1, 2005).  The district court in *Wirries* found that the insurer defined the insured's duties "solely under the DOT definition." *Id*. In doing so, the insurer failed to properly interpret the plan language "because 'regular

occupation' should have been defined as a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties." *Id*. *Wirries* therefore stands for the proposition that relying solely on the DOT to determine the important duties of an insured's regular occupation, without considering the duties of the job as the insured performed it, is improper. The determination of the duties of the insured's "regular occupation" is, however, expressly "not limited to [the insured's] particular job, but to a position of the same general character as the insured's previous job." *Id*.

As a result, in order to determine the material duties of Mrs. Held's regular occupation, the Court will consider both Mrs. Held's own description of her important duties and the description of her occupation from the DOT. Fortunately, in this case, Mrs. Held's description of her duties as a self-employed "Computer Software Trainer" and the description of duties for a "Training Representative" from the DOT overlap significantly. Mrs. Held described her important duties as teaching business employees computer skills, learning new software packages, and writing manuals for use in training. The DOT describes the duties of a Training Representative as "develops and conducts training programs . . .formulates teaching outline and determines instructional methods, utilizing knowledge of specified training needs . . . selects or develops teaching aids . . . conducts training sessions . . . [and] tests trainees to measure progress and to evaluate effectiveness of training." (Doc. 89 Ex. 41.) These descriptions of the duties are plainly complimentary. In addition, because the context in which Mrs. Held performed those duties informs the "general character" of her job, the duties of her occupation that arise from being self-employed are also relevant. As a result, Mrs. Held's duties included soliciting work, lifting and transporting presentation gear, and traveling to different job sites. If Mrs. Held remained unable to perform these duties—the important duties of her regular occupation—then she would remain totally disabled within the meaning of the Policy.

The crux of the dispute between the parties with respect to the important duties of

Mrs. Held's regular occupation is whether standing for eight to ten hours a day, bending, and lifting equipment should be considered a substantial duty of a trainer.  Mrs. Held contends that because she can no longer stand for an entire day, and move about a classroom bending and kneeling, she is unable to perform the important duties of her previous occupation.  RiverSource argues that as long as Mrs. Held can still teach business employees computer skills, she is able to perform a job of the same general character as her regular occupation, whether or not she can perform the job in the same way she did before.  The DOT supports this interpretation, according to RiverSource, because it classifies Training Representative as falling under the light to sedentary category of physical activity.

Because all inferences from the evidence must be drawn in the light most favorable to Mrs. Held at this stage, for the purposes of this Motion the Court will assume that standing, bending, and lifting were all at least incidental to important duties of Mrs. Held's regular occupation.  RiverSource does not contest that Mrs. Held was unable to do those things because of her disability.  The remaining question is thus whether the inability to perform those important duties that required her to stand, bend, and lift rendered Mrs. Held totally disabled.

**C.    Interpretation of Total Disability**

The parties dispute whether the definition of totally disabled in the Policy means that Mrs. Held must be unable to perform each and every duty of her regular occupation, or instead whether Mrs. Held must be unable to perform only the substantial and material duties.  The Policy at issue here contains both a definition of totally disabled and of partially disabled.  Under the Policy, an insured is partially disabled when, "although you perform one or more important duties of your regular occupation: 1. Because of injury or sickness, your monthly earnings are reduced to 80% or less of your monthly earnings before disability began."  Courts have diverged in their interpretation of total disability in light of partial disability terms like the one in the Policy.  In both California and Minnesota, the state supreme courts have made clear that total disability means unable to

1    perform the substantial and material duties of an occupation, not that the insured be

2    unable to perform all of the duties.  *See Erreca v. Western States Life Ins. Co*., 19 Cal. 2d

3    388, 121 P.2d 689 (Cal. 1942); *Dowdle v. Nat'l Life Ins. Co.*, 407 F.3d 967, 972 (8th Cir.

4    2005).  Other courts have concluded that, under a policy with both total and partial

5    disability provisions, those provisions must be read together such that an insured must

6    show that she is unable to perform all of the important duties of her regular occupation,

7    not just some of them.  *McOsker v. Paul Revere Life Ins. Co.,* 279 F.3d 586, 588 (8th Cir.

8    2002); *Klein v. Nw. Mut. Life Ins. Co.*, 337 F. App'x 4, 5 (2d Cir. 2009).  The Arizona

9    Supreme Court has not answered this precise question.

10        The Court need not resolve this conflicting authority, however, to resolve this

11   case.  Even if the Court assumes that Mrs. Held articulates the correct standard, there is

12   no genuine dispute of fact that Mrs. Held can perform some of the substantial, material

13   duties of her regular occupation.  In her position as a tenured professor at MCC, Mrs.

14   Held is responsible for teaching computer information system concepts and performance

15   skills in an online format, designing online courses, evaluating and selecting course

16   materials, and learning new software.  Those duties significantly overlap with the duties

17   of a Trainer both as Mrs. Held described them and as they are described in the DOT.

18        Mrs. Held's disability prevents her from standing, bending, and lifting.  As a

19   result, she cannot perform some of the duties of her regular occupation at the time she

20   became disabled.  But standing, bending, and lifting were a part of Mrs. Held's duties as

21   a Trainer; no plausible characterization of the scope of her duties could render them the

22   only substantial and material ones.  The duties of designing and writing course materials,

23   researching new software, and teaching computer skills were a substantial and material

24   part of Mrs. Held's occupation as a Trainer.  Mrs. Held is currently performing many of

25   the same duties in her capacity as a Professor or Business Personal Computers, Computer

26   Information Systems, and General Business.  Mrs. Held argues that the fact that she is

27   able to teach computer skills, learn new software, and write curriculum does not mean

28   that she is able to train.  But it does mean that she is able to perform many of the most

important duties of a trainer.  As a result, there is no genuine dispute that Mrs. Held remains able to perform one or more of the substantial, material duties of her occupation as a trainer.

Mrs. Held is not totally disabled within the unambiguous language of the Policy. RiverSource's determination that Mrs. Held was not totally disabled was both subjectively and objectively reasonable.  RiverSource's conclusion that Mrs. Held was did not qualify for total disability benefits therefore cannot represent a breach of the Policy.  Mrs. Held does meet the definition of partially disabled, but because she makes significantly more income in her current occupation than in her previous occupation, she does not qualify for partial disability benefits.  RiverSource is thus entitled to summary judgment on Mrs. Held's claim for breach of contract.

### D.    Remaining Claims

RiverSource is also entitled to summary judgment on Mrs. Held's remaining claims, for bad faith and punitive damages.  In order to prevail on a tort claim for insurance bad faith claim, an insured must prove that the insurer intentionally denied, or failed to process or pay a claim without a reasonable basis.  *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 237, 995 P.2d 276, 279 (2000).  In order to survive summary judgment then, Mrs. Held must present some evidence both that RiverSource acted unreasonably, and that it knew it was doing so and proceeded intentionally.  *Id*.  As a result, "[w]here an insurer acts reasonably, there can be no bad faith." *Trus Joist Corp. v. Safeco Ins. Co. of Am.*, 153 Ariz. 95, 104, 735 P.2d 125, 134 (Ct. App. 1986). RiverSource acted reasonably because it denied Mrs. Held's claim after correctly determining that she can perform many of the important duties of her regular occupation.

Even if RiverSource had not acted reasonably, however, it would be entitled to summary judgment on Mrs. Held's bad faith claim because she has presented no evidence that the claim was denied unfairly or dishonestly, or without fair and equal consideration of Mrs. Held's interests.  *Prieto v. Paul Revere Life Ins. Co.*, 354 F3d 1005, 1010 (9th Cir. 2004).   There is no genuine dispute that RiverSource conducted an adequate

1    investigation into Mrs. Held's claim, and the validity of Mrs. Held's claim was fairly

2    debatable.  RiverSource is therefore entitled to summary judgment on Mrs. Held's bad

3    faith claim.

4         Punitive damages require something more than bad faith; a plaintiff must also

5    show that the insurer's "conduct was guided by evil motives."  *Rawlings v. Apodaca*, 151

6    Ariz. 149, 162, 726 P.2d 565, 578 (1986).  When a plaintiff has failed to present enough

7    evidence to sustain a bad faith claim, therefore, the punitive damages claim must also be

8    dismissed.  Since RiverSource is entitled to judgment on Mrs. Held's claim for bad faith,

9    her claim for punitive damages must also be dismissed.  The Court notes, however, that

10   even if Mrs. Held had produced evidence sufficient to deny summary judgment on the

11   bad faith claim, her claim for punitive damages would be dismissed because she has

12   produced no evidence that could RiverSource's conduct was guided by evil motives in

13   this case.

14        **E.    Estoppel**

15        Mrs. Held contends that RiverSource should be equitably estopped from denying

16   her total disability benefits because it paid those benefits for 21 years before terminating

17   them in 2012.  The elements of a claim for equitable estoppel are: (1) conduct by which

18   one induces another to believe in certain material facts; (2) acts taken in justifiable

19   reliance on that conduct; (3) the resulting acts cause injury.  *Darner Motor Sales, Inc. v.*

20   *Universal Underwriters Ins. Co.*, 140 Ariz. 383, 394, 682 P.2d 388, 399 (1984).  Arizona

21   courts have applied the doctrine of equitable estoppel to prevent forfeiture of insurance

22   policies.  *U. S. Fid. & Guar. Co. v. Stewart's Downtown Motors*, 336 F.2d 549, 556 (9th

23   Cir. 1964).  However, the fact that Mrs. Held was initially found totally disabled, and

24   paid her benefits on the basis of that determination, does not operate "forever as an

25   estoppel so that an insurer can never change its mind."  *Muniz v. Amec Const. Mgmt.,*

26   *Inc.*, 623 F.3d 1290, 1296 (9th Cir. 2010).

27        The Policy at issue in this case made clear that Mrs. Held was required to provide

28   continuing proof of her loss, and that total disability payments were available only while

she remained totally disabled. RiverSource required Mrs. Held to provide yearly documentation of both her disability and of the duties of her current occupation. There is evidence that Mrs. Held understood that it was RiverSource's right to continue to monitor her claims. As a result, nothing about RiverSource's conduct would have induced Mrs. Held to believe justifiably that she was entitled to total disability payments indefinitely. Therefore, her equitable estoppel argument must fail.

### F. Waiver

Finally, Mrs. Held argues that RiverSource has waived its right to deny her claim by paying the claim for 21 years, a period during which Mrs. Held worked as an e-instructor at MCC. Waiver is "either the express, voluntary, intentional relinquishment of a known right or such conduct as warrants an inference of such an intentional relinquishment." *Am. Cont'l Life Ins. Co. v. Ranier Const. Co., Inc.*, 125 Ariz. 53, 55, 607 P.2d 372, 374 (1980). Mrs. Held argues that RiverSource had full knowledge of the fact that she was working at MCC as an e-learning specialist, and that its payment of benefits in light of that knowledge constitutes a wavier by RiverSource of its right to deny benefits.

RiverSource did pay Mrs. Held's policy after it knew that she worked at MCC as residential faculty. But, as discussed above, RiverSource made clear to Mrs. Held, and Mrs. Held understood, that RiverSource had the right to continually monitor her claims and to deny benefits if Mrs. Held was not totally disabled. RiverSource did not promise Mrs. Held permanent coverage, and Mrs. Held knew that she was required to continue to produce evidence of total disability. In February 2012, when a new claims adjuster, Ms. South, was assigned to Mrs. Held's claim, RiverSource asked for the first time for a detailed description of Mrs. Held's duties in her current occupation. RiverSource acted on that new information to exercise the right it had always retained, to evaluate continually whether Mrs. Held was totally disabled. A second adjuster, Mr. Engh, was later assigned to her case, reviewed that description, and determined that the essential duties of her current occupation were similar to her previous occupation. On that basis,

RiverSource denied her claim.   It was RiverSource's contractual right to do so, and nothing about its conduct suggests that it voluntarily intended to waive that right. Therefore, Defendant's Motion for Summary Judgment will be granted.

**IV.    Motion In Limine**

Also pending in this case is Mrs. Held's Motion In Limine To Exclude Defendants' Expert Witness (Doc. 83).   Mrs. Held argues that the expert testimony of Robert Taylor, a vocational specialist, should be excluded on the basis that it is irrelevant. RiverSource did not obtain an outside vocational assessment before it denied Mrs. Held's claim.   Mrs. Held argues that Mr. Taylor's post-termination assessment is therefore irrelevant because the focus of the Court's inquiry should be on the objective and subjective reasonableness of the insurance company's actions at the time they were taken, not in light of subsequent events.

The Court concludes that RiverSource's denial of Mrs. Held's claim was objectively and subjectively reasonable without the evidence of Mr. Taylor's vocational assessment.   As a result, the Court has not considered Mr. Taylor's testimony in determining that RiverSource is entitled to summary judgment. Mrs. Held's Motion will therefore be denied as moot.

The Court notes, however, that if this case were proceeding to trial, Mr. Taylor's testimony would be admissible on the issue of the important duties of a person in the occupation of computer trainer in general.   Determining the important duties of that occupation would be one of the central issues for the trier of fact, and Mr. Taylor's testimony would certainly be helpful in that determination.   Mr. Taylor's testimony would not be admissible on the question of the reasonableness of RiverSource's denial of Mrs. Held's claim in particular.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary judgment (Doc. 85) is granted.   The Clerk shall enter judgment for the Defendants and terminate this case.

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary

Judgment (Doc. 91) is denied.

IT IS FURTHER ORDRED that Plaintiff's Motion In Limine To Exclude Defendants' Expert Witness (Doc. 83) is denied as moot.

Dated this 28th day of August, 2013.

_____
Neil V. Wake
United States District Judge